STEPHEN D. ELY

*v.*

ELIZA A. WILSON and husband, JOHN S. SILVERS et ux., JAMES H. CONOVER et ux., et al.

[Submitted November 15th, 1900.   Decided December 27th, 1900.
Filed June 4th, 1901.]

Where the purchasers of portions of mortgaged property remained for more than twenty years in the full, exclusive, open, and actual possession thereof, without admitting the title of the mortgagee, and no claim for the principal or interest was made against them, the lien of the mortgage is lost as to such portions, though the debt was kept alive by payments made by the owner of the other portions.

On bill to foreclose. Heard on bill and answer by two sets of defendants, owners of parts of the mortgaged premises.

*Mr. Woodbridge Strong,* for the complainant.

*Mr. Willard P. Voorhees,* for Silvers.

*Mr. Abraham V. Schenck,* for Conover.

PITNEY, V. C.

The object of the bill (which was filed February 8th, 1896) is to foreclose a mortgage given on the 1st day of May, 1845 (nearly fifty-one years before the bill filed), by John I. Duncan and wife to Kenneth Applegate, to secure $3,000.

The complainant claims title through (1) the will of Applegate, (2) the will of his widow and universal legatee Gertrude Applegate, and (3) an assignment from one Wyckoff, the executor of Gertrude.

The mortgage covers two tracts of land, one, presumably farm land, containing thirty-three acres, and the other containing three and twenty hundredths acres, upon which was situate a mill and mill-site at Cranbury, in the county of Middlesex.

Complications have arisen in the case from the fact that the tract of thirty-three acres has been conveyed away by the mortgagor and released from the mortgage, and the mill tract of three and twenty hundredths acres has also been conveyed away by the mortgagor and subdivided, and three small tracts sold from it, one of which has also been released from the mortgage. These lots contained forty-five hundredths, forty hundredths and ten hundredths of an acre respectively, making ninety hundredths of an acre in the aggregate, and leaving two and twenty-five hundredths acres remaining in the mill lot proper.

Two of the tracts so sold off have not been released and are owned by the defendants Conover and Silvers, respectively.

Neither included any part of the mill or pondage, which latter at the time of the filing of the bill was owned by the defendant Mrs. Wilson. She did not answer. Decree *pro confesso* was taken against her, and after hearing all parties an order for sale *pendente lite* of the mill tract of two and twenty-five hundredths acres was made, and that sale produced a sum insufficient to pay the amount claimed by the complainant to be due on his mortgage.

The contest in the cause is whether or not the complainant may now resort for the balance to the several lots owned by Silvers and Conover which are part of the original mill tract and have never been released from the mortgage.

Two grounds were relied upon by both Silvers and Conover

for .relieving their lots from liability to pay this residue or any part thereof. One is that the holder of the mortgage has released a part of the mortgaged premises against which Silvers and Conover each had an equity to have it applied to the payment of the mortgage before their land should be called upon for that purpose. And, second, that the complainant's mortgage has ceased to be a lien upon their tracts, by reason of the lapse of time.

Bearing this in mind we will state the order of events in regard to the several conveyances and releases.

The first conveyance made by Duncan, the mortgagor, was of the whole mill tract (three and twenty hundredths acres) in March, 1847, to one James Prall. The conveyance of this tract contains covenants of ownership, power to convey and general warranty, and there is in it no mention of the complainant's mortgage. The result of this, standing by itself, would be at once to cast upon the thirty-three acre tract the burden of being first sold to pay the amount due on the mortgage.

Duncan and wife in 1859—twelve years later—conveyed the thirty-three acre tract for the consideration of $4,000 to one Chamberlain. That conveyance also contained covenants of ownership, power to convey, quiet possession and against all encumbrances and general warranty. No mention is made therein of the complainant's mortgage.

Prall—the owner of the mill tract—died in 1854, and on October 16th, 1855, commissioners in partition, by order of the orphans court of the county of Middlesex, conveyed to Elizabeth Prall, widow of James Prall, two and seventy-five hundredths acres, part of the mill tract of three and twenty hundredths acres, and containing the mill and pondage. No mention is made in this conveyance of the complainant's mortgage.

Mrs. Prall, by deed dated October 20th—four days later—conveyed to Hamilton Jones two and thirty-five hundredths acres out of the two and seventy-five hundredths acres so conveyed to her. This deed contains full covenants of ownership, power to convey, and general warranty, and no mention is made of the complainant's mortgage.

On the same day—October 16th, 1855—the commissioners above named conveyed forty-five hundredths of an acre, the remaining part of the mill tract, to Tyler D. Conover by deed containing the same verbiage as that to Mrs. Prall, and without mentioning the complainant's mortgage. The defendant Conover is his heir and holds the title as such.

So far there is nothing on the record to indicate that the equity arising out of the original conveyance from Duncan to Prall in favor of Prall as against the thirty-three acre tract had been affected or released. Jones and Conover were clearly entitled to the benefit of that equity, so far as the record shows.

Then Mrs. Prall, coincident in time with her conveyance to Jones, to wit, October 20th, 1855, conveyed forty hundredths of an acre out of the two and seventy-five hundredths acres conveyed to her by the commissioners, to Henry Vanderwater; and on October 23d, 1855, Mrs. Applegate, then the holder of the complainant's mortgage, released to Vanderwater the forty hundredths of an acre so conveyed to him.

Eight and a half years later, namely, on the 19th of April, 1864, Mrs. Applegate, still the holder of the complainant's mortgage, released to Chamberlain the thirty-three acre lot previously—in 1859—conveyed to him by Duncan and wife. It is upon this release that the defendants mainly rely in support of their first defence.

The mill tract, containing two and thirty-five hundredths acres, passed by various conveyances until it became vested in one Nutt, and on the 28th of April, 1865 (thirty-one years before the bill was filed), Nutt and wife conveyed a small corner to one Dey, and the tract so conveyed to Dey became vested in the defendant Silvers.

We now come to facts which tend to destroy the equity between the owner of the mill-lot of two and thirty-five hundredths acres and the owner of the thirty-three acre tract.

The name of the owner mentioned as Hamilton Jones was James H. Jones, and he was examined as a witness. He swears that when he purchased the property from Mrs. Prall, shortly after the conveyance to her by the commissioners in 1855, and

before Duncan, the mortgagor, conveyed the thirty-three acre tract, he assumed the complainant's mortgage as a part of the consideration money, and gave her a mortgage for $5,500 besides, and also something in cash; and that in less than two years the grist-mill, saw-mill and dwelling connected with it were burnt down, when he made an assignment for the benefit of his creditors, and a few months later took the property back from them.

This arrangement sworn to by Jones indicates that when Prall purchased the mill property from Duncan, the mortgagor, he verbally assumed as part of the consideration to pay the complainant's mortgage in destruction of the equity which would otherwise arise out of the covenants of the deed in his favor as against the thirty-three acre tract retained by Duncan.

Jones further swears that Mrs. Applegate, the owner of the mortgage, lived on the main street of Hightstown, about a mile and a half from the mill, and that Thomas Applegate, a nephew, was her agent and took charge of her business. The mill was not insured, and its destruction by fire substantially ruined Jones, but, as we have seen, he took title back from his assignees, and swears that he rebuilt the mill and tried to go on, but was unable to pay the interest on the mortgages, and, for that reason, in November, 1858, conveyed the property to William A. Shreve, the brother of Mrs. Prall and one of the executors of her husband.

In the list of creditors annexed to the deed of assignment by Jones to assignees in insolvency, which is dated May 22d, 1857, appears the following: "Mortgage to Applegate, $3,000; mortgage to Elizabeth Prall, $5,500."

In the deed from the assignees back to Jones, dated September 25th, 1857, the consideration is expressed as follows: "Fifty cents over and above encumbrances, which are two mortgages and the interest, amounting to $9,062."

In the deed from Jones and wife to Shreve is found the following language:

"Said William A. Shreve does assume to pay two mortgages on said property, one held by the widow of Kenneth Applegate for $3,000, one held by Elizabeth Prall for $5,000, and the interest due on said mortgages."

It is thus rendered clear that the mill tract was properly chargeable with complainant's mortgage in favor of the thirty-three acre tract.

Shreve conveyed the mill property to Nutt, and that deed is made subject to a mortgage to Elizabeth Prall for $3,250. And Nutt and wife, in December, 1870, conveyed the premises to one Snedecker subject to a bond and mortgage held by Gertrude Applegate for $2,900, which is the amount of principal claimed by complainant on his mortgage.

The mill property subsequently became vested in Charles H. and Henry Smith, and they, on December 29th, 1879, conveyed the premises to the defendant Eliza A. Wilson, subject to the Applegate mortgage for $2,900.

This statement shows that the defendant Silvers and the defendant Conover stand in a different position so far as relates to the equity against the thirty-three acre tract. Conover cannot be held to be affected either by the verbal agreement which it is fair to infer must have existed between Prall and his grantor, Duncan, the mortgagor, that Prall should assume the payment of the Applegate mortgage, or by the verbal agreement proved to have existed between Mrs. Prall and Hamilton Jones that the complainant's mortgage should be assumed by him and taken as a part of the consideration money of her conveyance to him. Both of them were latent equities, not appearing on the record, and there is no proof that Conover had any notice of them, nor is he bound by the actual assumption of the mortgage contained in the deed from Jones to Shreve, for it was made subsequent to his purchase, while Silvers, grantee of Dey, is or may be affected by that assumption.

Taking up the case of Conover on the question of the effect of the release of the thirty-three acre tract, the only difficulty arises out of the question whether, when Mrs. Applegate in 1859 released the thirty-three acre tract to Chamberlain, she was chargeable with notice that the commissioners of Prall, or somebody claiming under him, had conveyed to Conover the forty-five hundredths of an acre tract from the mill property to Conover.

To sustain that position Conover's counsel relies on several

circumstances. First, that she lived within a mile and a half of the premises, and her nephew and agent came there demanding payment of the interest, not of Conover, but of Jones, the owner of the mill tract. And further, that the conveyances by the commissioners to Conover of the forty-five hundredths of an acre, and to Mrs. Prall of the balance of the mill tract, and then the conveyance by Mrs. Prall of a part of that balance to Vanderwater, and the release to Vanderwater, were all substantially coincident in time; and that the release signed by Mrs. Applegate to Vanderwater, dated October 23d, 1855, describes the land as follows:

"Lot which the said Henry Vanderwater purchased of Elizabeth Prall, situate, lying and being in the township of South Brunswick, county of Middlesex and State of New Jersey, butted and bounded as follows: beginning on the northwesterly side of the main street or road in the village of Cranbury *and line of Tyler D. Conover;* and from thence running on said road north forty-six degrees east seventy-six links or fifty feet; thence north forty-four degrees west four chains and thirty-four links to the mill race; thence down the same south eighty-five degrees west eighty-six links to Tyler D. Conover's line; thence along the same south forty-three degrees and forty-five minutes east four chains and seventy links to the place of beginning. Containing forty-hundredths of an acre, be the same more or less."

It is worth while to stop to say that the original mill tract was in shape approximately an isosceles triangle, with an acute apex. The brook ran along and near to the west side, and the road along the east side. The Conover lot is composed of a slice taken—not by a straight line—from the base of the original lot, and the Vanderwater lot (which was released) was taken off just above it. So that the Conover lot was separated by the Vanderwater lot from the mill-lot as it remained after those conveyances. The Dey lot was taken from the northwest side.

In this connection let us turn to the allegation of the bill. That sets forth all these conveyances and releases, not, however, with absolute accuracy in each case, and we find in it no allegation of any recognition of the complainant's mortgage, or any claim on the part of the complainant against the owner of the Conover lot for the payment of interest, except so far as it may be inferred from the allegation in the bill that $100 of prin-

cipal has been paid, and that $2,900 remains due, with interest from April 1st, 1894.

The clear proof—in fact, the written admission of the parties—is that both Conover and Dey, directly after the several conveyances were so made to them, took actual possession of their several lots, fenced them in and built dwellings upon them, and have ever since had exclusive, actual and open possession of them.

It is claimed that from this possession of the Conover lot, and failure to demand interest from the owner, an inference may be drawn that Mrs. Applegate and her agent must have had actual notice of the conveyance to Conover, and such notice would make the release by her of the thirty-three acre lot inequitable as against Conover. And it is further alleged that the verbiage of the release of the Vanderwater lot is of itself such notice.

This position is not without strength, but I find it unnecessary to come to a conclusion upon it, since, for other reasons, I think complainant's claim must fail, not only as against the Conover lot, but also against the Dey lot, in whose favor no such facts exist.

The proof is clear, as we have seen—in fact, it is admitted—that both Conover and Dey have been in the full, exclusive, open and actual possession of their respective lots for more than thirty years before the filing of the bill, and during all that time neither ever admitted in any manner the title of the mortgagee, by payment of interest or otherwise, and no claim for either principal or interest was ever made against either of them. Their possession was open and visible to the holder of the mortgage, who lived in the immediate neighborhood, and it was beyond all question, as it seems to me, adverse to the mortgagee's claim. And I am of opinion that the fact that the interest on the debt was paid (not by the obligor, but by the owner of the mill tract proper), with reasonable punctuality, up to the year 1894, does not save the lien of the complainant's mortgage upon the two lots of Conover and Dey.

This result is contrary to what was decided by Vice-Chancellor Emery in *Longstreet* v. *Brown, 37 Atl. Rep. 56,* and by

Vice-Chancellor Reed in *Mundy* v. *Smith,* July, 1899, in an opinion not reported (such non-report being due, as I understand, to the direction of the learned vice-chancellor), but both of those cases were dealt with before the publication of the opinion of the court of errors and appeals in the case of *Colton* v. *Depew, 14 Dick. Ch. Rep. 126.* That opinion, taken in connection with that of the same court in the case of *Blue* v. *Everett, 11 Dick. Ch. Rep. 455,* seems to me to do away with and supersede the main considerations which had previously influenced the action of the court in dealing with the effect of the lapse of time upon the rights of mortgages.

Prior to the publication of the opinion in *Blue* v. *Everett,* this court had always ignored the question as to whether the mortgagee was barred by lapse of time of his right to maintain an action at law to recover his debt; had, in fact, to some extent, ignored the effect of the statute of limitations, and had confined itself to the single and simple inquiry, Has the debt been actually paid? It it had not been paid, then, no matter how old might be the mortgage, the title was still maintained as security for the debt. It is proper to say, however, that this court did not entirely ignore the statute of limitations, but used it by way of analogy, and presumed that the debt had been paid if its existence had not been acknowledged by the mortgagor or his grantee within twenty years; and it held that payment on account by the holder of the title was such an acknowledgment. In the application of this rule, so called, the question arose whether such presumption was conclusive or not, so as to preclude proof that the debt had not, in fact, been paid. This question was discussed and settled by Vice-Chancellor Emery in *Blue* v. *Everett,* when that case was before him, as reported in *10 Dick. Ch. Rep. 329.*

The court of errors and appeals, in affirming the decree so advised by the learned vice-chancellor, went further, and laid down a new rule, which, as I interpret it, declared the law to be that, after twenty years from the default in payment by the mortgagor, the mortgagee, in order to have relief in equity, must show a right of action at law to recover his debt which was not barred by the statute of limitations. If he had a sealed instru-

ment to secure the debt, he must' show a payment or other competent acknowledgment within sixteen years. If he held only a simple promise to pay, then his acknowledgment must be within six years. The complainant's right in an ordinary foreclosure was asserted to be a purely legal one, based either upon the right to sue at law for the debt or to bring an action of ejectment based upon the mortgage.

It is true that this statement of the law was made by the single judge who gave the reasons of the court for the decree of affirmance. But the language used therein indicates that he thought at least that he was speaking for the whole court. For it is to be observed that after stating the grounds relied upon by the learned vice-chancellor in the court below, he says: "Without considering the questions decided below, *we* think the decree should be affirmed on broader grounds." And then proceeds to state with elaboration the doctrine above stated and its foundation, and closes as follows: "The complainant's rights, under both his bond and his mortgage, are purely legal in their nature, and as they have been barred, that under the bond by the lapse of sixteen years since the last payment was made, and that under the mortgage by the lapse of twenty years since the breach of the condition, they should be denied in equity as well as at law."

This statement of the doctrine startled the profession, and provoked the plea interposed in *Colton* v. *Depew.* There, more than twenty years had elapsed since the pay day named in the mortgage, and the action on the bond was barred by a discharge in bankruptcy, as well as by the statute' of limitations, no payment having been made within sixteen years, but a payment had been made by the owner of the mortgaged premises just within twenty years. Upon these facts the complainant seemed to be barred by the rule laid down in *Blue* v. *Everett.*

Vice-Chancellor Stevens, when the case was before him, distinguished it from *Blue* v. *Everett* and held that the payments made in that case, as in this, by the grantee of the mortgaged premises could not be treated as payments applicable to the bond, but must be considered as acknowledgments by the holder of the legal title of the existence of the mortgage, and advised a decree for the complainant. *14 Dick. Ch. Rep. 126.*

The court of errors and appeals, when that case came before
it on appeal, in giving its reasons for affirming the decree, re-
viewed the opinion in *Blue* v. *Everett,* and confined the question,
as the learned vice-chancellor had done, to the character of the
possession of the mortgaged premises by the mortgagor or his
grantee: Was such possession adverse to the title of the mort-
gagee, and was it continued for twenty years? If not adverse,
and not so continued for twenty years, then it mattered not that
the right of action on the bond or promissory note, as the case
might be, was barred by the statute of limitations, and that more
than twenty years had elapsed since default on the mortgage.

By that decision, as I interpret it, the payment of interest
by the mortgagor or his grantee is treated as an acknowledgment
of the title of the mortgagee and of his right to possession as
such of the mortgaged premises, and that the possession of the
mortgagor or his grantee is not adverse to the right of the
mortgagee.

. The result of the doctrine thus established is, as it seems to
me, that a payment on account of the debt, in order to be efficient
to preserve the mortgagee's right against lapse of time, must
be made by the party in possession of and claiming title to the
mortgaged premises. A payment by the bondsman after he
has parted with the title and the possession of the mortgaged
premises will not, necessarily, avail the mortgagee as an acknowl-
edgment of his title, and may be entirely consistent with adverse
possession of the premises by the assignee of the mortgagor. In
like manner, as it seems to me, a payment by the owner of one
distinct portion of the mortgaged premises, who, perhaps, has
assumed payment of the whole mortgage debt, cannot, standing
alone, be construed as an admission, by the owner of another
distinct portion, of the title of the mortgagee to that distinct
portion of the premises.

One clause in the exhaustive opinion of Mr. Justice Depue
in *Colton* v. *Depew* is significant: "The mortgagee has two
securities for the debt—the bond and the legal estate in the
mortgaged premises. A payment on the debt may be made by
the obligor on the bond, or by the grantee of the mortgaged
premises. Where the obligor has conveyed the premises, his

grantee has no interest in keeping alive the contract to pay contained in the bond. A payment of interest or part principal on the debt may be made by the obligor or by his grantee. If such payment be made [as it has been here] by the owner, who was not the obligor, it would not, at law, remove the bar of the statute of limitations in an action against the latter." And I think the converse of that proposition follows, viz., a payment by the obligor, who is no longer the owner of the mortgaged premises, will not affect or bind such owner.

The practical effect of this new rule is that the mortgagee, in order to insure the safety of his lien after the lapse of twenty years from the pay-day named in the mortgage, must inquire who is the party making the payment upon which he relies— whether it be by the party in possession as owner of the mortgaged premises, or by some one liable for the debt merely. He can no longer rely upon the mere keeping alive of the mortgage debt. The payment must be made by the person in possession as owner; and I think that where the premises have been divided in title and open and visible possession taken by each of the several grantees, the mortgagee must inquire whether the payment which he receives represents all the owners. Such, as it seems to me, is the logical result of *Colton* v. *Depew.*

I perceive nothing in this result contrary to settled rules and established principles. It imposes no greater hardship or degree of vigilance upon the mortgagee out of possession than the law imposes upon every owner of land who is not in the actual possession of it. If such owner out of possession desires to preserve his title he must see to it that no person is in the actual possession not only of the whole, but also of any part of his land, under a claim of title adverse to him. The mortgagee must do the same. The division of a tract of land into portions and the occupation of such portions by different parties assuming varying attitudes towards a claimant of the whole is one of the ordinary incidents of such a state of things. The books record numerous instances where parties have succeeded in establishing title to portions of tracts by an adverse possession of such portion.

It seems to me plain enough that the possession of both Conover and Dey was adverse to the holder of the mortgage.

Neither was under any personal obligation to pay any part of the mortgage debt. Neither of their lots was, as between them and the principal mill-lot, under equitable obligation to be subjected to pay any part of that debt. Each held under conveyances made and taken in good faith for a full consideration, without mention of the mortgage debt. Neither, as it seems to me, can be held or deemed to have authorized the owner of the main tract to make for either an acknowledgment to the holder of the mortgage of the continued existence of its lien upon his lot.

For these reasons it is difficult, under the circumstances, to see how the holder of the mortgage, at the time he filed his bill, could maintain ejectment against either of those defendants. And the right to maintain ejectment is the test of the right to equitable interference.

If it be asked how a mortgagee may retain his lien upon the whole of the premises in a case like this, and allow his mortgage to rest beyond twenty years, it seems to me that the question is quite aside from the problem to be solved, and therefore need not be answered. But the proceedings to be taken by the mortgagee to protect himself, under such circumstances, seem to me to be sufficiently obvious and simple. He could, in this case, before twenty years had elapsed, have called on the owners of the Conover and Dey lots and asked them whether they still acknowledged the lien of his mortgage, and if they answered in the affirmative, he could have required them to put their acknowledgment in writing. If they had declined to give such acknowledgment, then it was open for him to determine whether he would retain the mortgage upon the security of the principal mill-lot, or would foreclose. If he was willing to retain his mortgage upon the security of the principal mill-lot alone, he could do so and abandon the lien upon the other two lots. If he was not so willing, and Conover and Dey declined to acknowledge the lien of his mortgage, then, of course, he would be driven to foreclose, precisely as he would if the owners of the principal mill-lot, as well as the others, had declined to acknowledge the lien of his mortgage by payment.

And it seems to me that there was no difficulty in the mort-

gagee determining in this case the time when the adverse pos-
session by Conover and Dey commenced. It was from the time
that they took open and notorious possession of their separate
lots, fenced them in, built upon and occupied them. It was a
part of the case that the payment of interest was made by the
owner of the principal mill-lot, and there is nothing in the case
to show that the mortgagee had any reason to suppose that
Conover and Dey made any contribution toward it or authorized
it as an acknowledgment of her title on their part.

In *Longstreet* v. *Brown* Vice-Chancellor Emery was dealing
with a case like the present, where a part of the mortgaged
premises had been conveyed away for value and without any
assumption of the mortgage debt or any part of it, which had
been kept alive by the payment of interest by the owner of the
part of the premises retained by the mortgagor. The learned
vice-chancellor held that such payment kept the mortgage alive
as against the owner of the property sold off, on the ground that
the payment was for his benefit; and the decision is, as I have
stated, based wholly upon the debt itself being shown to be in
existence within twenty years, and so not within the time re-
quired to warrant a presumption of payment. But the learned
vice-chancellor distinctly points out that the question here in-
volved, namely, "whether the possession of the mortgagor or his
grantees for twenty years after default is to be considered a
possession adverse to the mortgagee, so as to deprive the latter
of the equitable remedy of foreclosure, has not been decided
by our courts." That question has now, as I conclude, been
decided by our highest court in *Colton* v. *Depew;* for it seems
plain to me, as before remarked, that the logical result of that
decision is that a mere acknowledgment of the existence of the
debt by one not interested in the land pledged to its payment
cannot be construed as an acknowledgment of the right of the
mortgagee in the land.

I do not find it necessary to state the unreported grounds of
Vice-Chancellor Reed's decision in *Mundy* v. *Smith,* since that
learned judge agrees with me that they cannot stand against
*Colton* v. *Depew.*

I will therefore advise a decree dismissing the bill as against Conover and Silvers, and I think, after examining the pleadings, that it must be with costs.